Steven Johnson v. State of Maryland, No. 102, Sept. Term 2013, Opinion by Battaglia, J.

**CRIMINAL PROCEDURE – PETITION FOR DNA TESTING – SEARCHES FOR SCIENTIFIC IDENTIFICATION EVIDENCE**

Circuit Court properly dismissed a post-conviction petition for DNA testing of scientific identification evidence in the State's possession under Section 8-201 of the Criminal Procedure Article of the Maryland Code upon a prima facie showing by the State that it no longer possessed the T-shirt and cigarette package sought and, in the case of a "sex crimes kit", that the kit, even had it been found, only included blood drawn from the victim at the time of the offense.

Circuit Court for Charles County
Case No. K-80-7357
Argued: October 7, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 102

September Term, 2013

STEVEN M. JOHNSON

v.

STATE OF MARYLAND

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Battaglia, J.

Filed: November 21, 2014

Under Section 8-201 of the Criminal Procedure Article of the Maryland Code,[1] a person convicted of certain specified crimes[2] is permitted to file a petition "for DNA testing of scientific identification evidence that the State possesses . . . and that is related to the judgment of conviction".

In 2011, Steven Johnson filed, *pro se*, a Motion for New Trial, later referred to as a Petition for DNA Testing, in which he requested that the State produce a T-shirt recovered from the victim and admitted into evidence in Johnson's trial in 1980,[3] as well as an empty cigarette package recovered from the crime scene and a sex crimes kit produced by

---

[1] Section 8-201 provides, in relevant part:

> (b) Filing of Petition. Notwithstanding any other law governing postconviction relief, a person who is convicted of a violation of § 2-201, § 2-204, § 2-207, or §§ 3-303 through 3-306 of the Criminal Law Article may file a petition: (1) for DNA testing of scientific identification evidence that the State possesses as provided in subsection (j) of this section and that is related to the judgment of conviction; or (2) for a search by a law enforcement agency of a law enforcement data base or log for the purpose of identifying the source of physical evidence used for DNA testing.
>
> * * *
>
> (k) . . . (6): An appeal to the court of appeals may be taken from an order entered under this section.

Md. Code Ann., Crim. Proc. § 8-201 (2001, 2008 Repl. Vol., 2011 Supp.). Section 8-201(b) has remained unchanged to the present.

[2] Section 8-201 applies to convictions for first degree murder, second degree murder, manslaughter, first degree rape, second degree rape, first degree sex offense and second degree sex offense.

[3] Johnson was convicted on October 22, 1980 of first degree sex offense, kidnapping of a child under sixteen years of age and assault and battery in the Circuit Court of Charles County.

Physician's Memorial Hospital,[4] the hospital in which the victim had been examined.

Judge Helen Harrington of the Circuit Court for Charles County, after three hearings,[5]

---

[4] Physician's Memorial Hospital, located in La Plata, Maryland, changed its name in 1998 to Civista Health and, in 2011, became affiliated with the University of Maryland Medical System and is now also known as the University of Maryland Charles Regional Medical Center. History, UM Charles Regional Medical Center, http://www.charlesregional.org/fuseaction-AboutUs.showHistory.htm (last visited November 20, 2014).

[5] During the first hearing, the State only had produced a memorandum from a representative of the Property Management Unit of the Charles County Sheriff's Office stating that the T-shirt, cigarette package and sex crimes kit could not be found. The State, thereafter, was granted a postponement to secure affidavits in compliance with Rule 4-706(c)(2)(B) (2011), which states that "if the State asserts that it has been unable to locate the evidence, an affidavit containing a detailed description of all steps it took to locate the evidence," must be included in the State's answer.

During the second hearing, the State produced affidavits executed by Charles Smith, the civilian property custodian of the Sheriff's Office, and Shelly Herold, a technician in the Sheriff's Office's Forensic Science Unit. Mr. Smith's testimony was also adduced. Records from the Sheriff's Office pertaining to property recovered during the investigation of the underlying offenses, as well as the Charles County Crime Laboratory's fingerprint analysis and the hospital report completed by the physician who had examined the victim after the incident, also were admitted into evidence. At the conclusion of the second hearing, Judge Harrington raised various questions:

> [THE COURT:] I can't think of any reason why the investigating officer would submit a report saying that a sex crime kit was used and evidence collected and turned over to the officer if all they did was draw blood.
>
> I also can't think of any reason why the medical reports would list evidence box if all they did was draw blood.
>
> It doesn't make sense to me and I think there needs to be some further investigation to see if there are any records anywhere and I'm suggesting checking with Maryland State Police and the FBI to see if anything was submitted to either of those facilities for testing at that time.
>
> * * *
>
> I would also point out that Sergeant John Wood's signature is all over these property papers and I believe he's still in the area. So I think there needs to be a conversation with him to see if he can shed any light as to what procedures were being used, what might have happened.

(continued . . . )

found that the Charles County Sheriff's Office no longer had possession of the T-shirt, cigarette package and "sex crimes kit"; as to the "sex crimes kit", she also decided that even were the kit to have been produced, it only would have contained blood drawn from the victim. Johnson, thereafter, noted a direct appeal to this Court in which he asks us to resolve the following question:[6]

> Did the circuit court err in finding that the State had performed a reasonable search for requested evidence which might contain biological identification material?

We shall affirm the Circuit Court's findings and conclude that the Judge was not clearly erroneous when she concluded that the State performed a reasonable search for the requested scientific identification evidence and that the evidence no longer existed.

At the end of three hearings, Judge Harrington stated:

[THE COURT:] I think there has been a reasonable search. . . .
 And there is no evidence whatsoever that there has been any intentional or willful destruction of evidence. It simply doesn't exist. We can't find it.

_____

( . . . continued)

*  *  *

 I think as regards to Sherry; Shelly Herold's affidavit I think there's legitimate question exactly how did she go about doing her search; what was she looking for.
 At the third hearing, the State offered the testimony of Retired Sergeant John Wood, of the Charles County Sheriff's Office, as one familiar with the Sheriff's Office's evidence storage protocols at the time of the underlying investigation. Judge Harrington also admitted into evidence correspondence from the FBI Crime Laboratory and the Maryland State Police Crime Laboratory indicating that neither had received nor tested evidence in Johnson's case.

[6] *See Arrington v. State*, 411 Md. 524, 544, 983 A.2d 1071, 1083 (2009) ("[W]e conclude that the right of appeal granted in CP Section 8-201(k)(6) is a direct right of appeal to this Court, which does not require a litigant to petition for *certiorari*.").

3

So I have to deny the Motion for a New Trial based on a request for post-DNA; post-conviction DNA.

Judge Harrington also made specific findings that the T-shirt, cigarette package and sex crimes kit were no longer in the possession of the Sheriff's Office and, therefore, were unavailable for testing. She had found, at the end of the second hearing, that the Sheriff's Office had twice inventoried all items in its evidence storage area, Building 104, without having uncovered the T-shirt, cigarette package or sex crimes kit from which she concluded that the evidence sought by Johnson was no longer in the possession of the Sheriff's Office:[7]

> [THE COURT:] I'm reasonably satisfied that evidence that was in property held and transferred from the old units to the new units was inventoried and logged in not just once but twice. So I think the loose ends have more to do with where else might it be rather than whether things are actually in the Sheriff's possession right now.

Charles Smith, the civilian property custodian of the Sheriff's Office, had testified at the second hearing and explained that all items of evidence held in Building 104 had

---

[7] Judge Harrington, at the third hearing, reiterated her finding that the T-shirt, cigarette package and sex crimes kit were not in the Sheriff's Office's possession at the time of the two inventories of Building 104:
> I have testimony here as to how the search was conducted going through each and every evidence box and inventorying it not just once but twice when they had to move the location.
> * * *
> The property held room was moved to a different location, inventoried on the way out, on the way into the new location and then again a couple of years later when they had a mold problem they had to unload everything and pack it back in.

4

been moved twice.[8]  According to Mr. Smith, the property that had been held in Building 104 was moved in 2006, when the Sheriff's Office had been relocated, and again in approximately "2008, 2009", when the building had been emptied in order to enable the County to "take care of" a mold problem.  Mr. Smith also stated that he perused the handwritten inventories compiled during both relocations and had not found any reference to the T-shirt, cigarette package or sex crimes kit.  Mr. Smith further testified that, prior to the second hearing before Judge Harrington, he and others had searched "around the whole building" in order to confirm that the T-shirt, cigarette package and sex crimes kit were not obtainable.

Judge Harrington's conclusion that the State had performed a reasonable search for the sex crimes kit at the Sheriff's Office was based not only on the affidavit and testimony regarding Building 104, but also upon another affidavit by Shelly Herold, a technician in the Charles County Sheriff's Office Forensic Science Unit.  Ms. Herold affirmed that she had searched the Forensic Science Unit's storage areas for the sex crimes kit, to no avail.[9]

---

[8] Mr. Smith testified that the Sheriff's Office still possessed other evidence from Johnson's case in Building 104: one "can of White Rose Petroleum Jelly" and one "brown and tan checkered shirt", recovered during the investigation.

[9] Ms. Herold stated in her affidavit:
> I attempted to locate any evidence in the above case at the Charles County Sheriff's Office Forensic Science Unit with negative results.  The F[orensic] S[cience] U[nit] short term storage locker, F[orensic] S[cience] U[nit] long term storage freezer, and the F[orensic] S[cience] U[nit] long term storage refrigerator were all searched with negative results.

Regarding the sex crimes kit, Judge Harrington also found that Physician's Memorial Hospital did not possess the sex crimes kit and even had the kit been found it would have only contained blood drawn from the victim:

> [THE COURT:] There is evidence that there was [a sex crimes kit] but there's no evidence that it was ever logged in to The Sheriff's Department. It apparently does not appear to have been their procedure at that time.
>      There's no information indicating that it has been preserved or kept in any refrigerator there.  We do have that affidavit from Shelly Herold that says that she did a search.

* * *

> [COUNSEL FOR JOHNSON:] If you, if you collect evidence from a rape kit by definition you're gonna have skin cells on it and that's biological material that could be submitted to testing.
>      And with respect to the shirt, you know, it's a kind of ridiculous - -.
> THE COURT:  Yeah, as I said it could be there but I, we don't have any evidence that there were . . . [s]kin cells collected at the hospital.  There was a blood, blood work; blood draw.

Judge Harrington also relied upon the report compiled by Sergeant George Watts, the investigating officer in Johnson's case, as well as the report completed by the physician who had examined the victim at Physician's Memorial Hospital; both reports had been introduced into evidence during the second of the three hearings.  The authors of both reports noted that the examining physician had handed the sex crimes kit over to Sergeant Watts after examining the victim, thereby establishing that the Hospital did not retain the sex crimes kit.[10]

---

[10] The language from Charles County Sheriff's Office's report was:
>      A sex crimes kit was used by the medical staff and evidence was collected.
>      The kit was then turned over to the undersigned officer.

(continued . . . )

Judge Harrington's finding that the sex crimes kit had only contained blood taken from the victim was based upon the hospital report upon which was written, under the heading "Evidence Collected by Examining Physician", that only "BLOOD" had been collected from the victim.[11]

Johnson argued both before the trial court as well as before us that, because "the victim's t-shirt, a cigarette package, and a sex crimes kit-did exist at one point", it is "reasonable that all or some of the items [Johnson] now seeks are somewhere in the State's possession." Johnson asserts that the State must produce "all relevant property logs" from the Charles County Sheriff's Office as part of a reasonable search. Producing the property logs, he reasons, would provide his counsel an opportunity to review them with an "advocate's eye" to determine if there were entries missed which could lead to the discovery of the missing T-shirt, cigarette package and sex crimes kit.

---

( . . . continued)
Similarly, the report from Physician's Memorial Hospital noted:
    10:50pm Collected evidence given to Sheriff Officers
Sergeant Watts's signature appears on both the hospital report and the Sheriff's Office's report.

[11] The types of evidence that could have been collected from the victim by the examining physician and recorded on the hospital report under the heading "EVIDENCE COLLECTED BY EXAMINING PHYSICIAN" also were:

| | |
|---|---|
| 1. CLOTHING | 8. HAIR, HEAD-CUT |
| 2. HAIR, PUBIC-CUT | 9. HAIR, HEAD-PULLED |
| 3. HAIR, PUBIC-PULLED | 10. HAIR, HEAD-COMBED |
| 4. HAIR, PUBIC-COMBED | 11. BLOOD |
| 5. HAIR, ANAL-CUT | 12. OTHER |
| 6. HAIR, ANAL-PULLED | |
| 7. HAIR, ANAL-COMBED | |

Johnson also argued before the trial court as well as before us that "evidence, testimony, or affidavits as to the procedures in place at the hospital for conducting the sexual assault kit" must be produced, because they would demonstrate that more than the victim's blood had been collected, as well as "what was then done with the examination." For support that more than blood drawn from the victim had been collected, Johnson asserts that "if a hospital subjected a victim to a sexual assault kit, it would be reasonable to assume that, even in 1980, more than just blood was taken".

In evaluating whether the State has conducted a reasonable search, we ask whether it has "demonstrated sufficiently a prima facie case, either directly or circumstantially, that the requested scientific identification evidence no longer exists". *Washington v. State*, 424 Md. 632, 651, 37 A.3d 932, 942 (2012). The Circuit Court's finding that the State had met its burden and shown that the requested evidence no longer exists is reviewed under the "clearly erroneous" standard of review. *Id.*, citing *Blake v. State*, 418 Md. 445, 460, 15 A.3d 787, 796 (2011) (hereinafter "*Blake II*"). *See also Fuster v. State*, 437 Md. 653, 89 A.3d 1114 (2014); *Arey v. State*, 422 Md. 328, 29 A.3d 986 (2011) (hereinafter "*Arey II*"). Under the "clearly erroneous" standard, "if there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Washington*, 424 Md. at 651, 37 A.3d at 942, quoting *Solomon v. Solomon*, 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004). Based upon the application of these principles, we conclude that Judge Harrington did not err in her finding that the State conducted a reasonable search for the T-shirt, cigarette package and sex crimes kit. Her decision is supported by undisputed

8

evidence that the T-shirt, cigarette package and sex crimes kit could not be located by the State.

Our conclusion that Judge Harrington did not err is guided by our past jurisprudence that has refined the standard of what is a reasonable search under Section 8-201. In *Washington*, 424 Md. at 635, 37 A.3d at 933, Washington had sought for testing, under Section 8-201, evidence compiled during the investigation that had led to his 1990 rape conviction. The circuit court ultimately concluded that "a reasonable search was undertaken which included the Wicomico County State's Attorney's Office and Sheriff's Office, the Maryland State Police Crime Laboratory, [the hospital in which the victim had been examined] and the clerk's office of the Circuit Court" based upon testimony and affidavit that each shelf and box in these locations had been searched for the evidence Washington had requested. *Id.* at 648, 37 A.3d at 941. The hearing judge in *Washington* also determined that "the evidence presented at the hearing showed that the searches for evidence related to this case, dating back to 2002, produced no results" and, therefore, "the evidence was either lost or destroyed prior to that time." *Id.* at 648-49, 37 A.3d at 941.

We opined in *Washington* that the circuit court had not erred when it found that the State had conducted a reasonable search. We also held that it was irrelevant that the State had not introduced the storage protocols of the Sheriff's Office, because the protocols "would only indicate that the requested scientific identification evidence was in the possession of the Sheriff's Office", which had already been reasonably searched to no avail. *Id.* at 661-62, 37 A.3d at 949.

9

*Washington* informs us that the search conducted here was reasonable, as well as that production of the Hospital's protocols is not required in the present case. Judge Harrington determined that the T-shirt, cigarette package and sex crimes kit were no longer in the State's possession based upon Charles Smith's testimony, from which she found that Building 104 had been fully inventoried twice and searched once without having uncovered the evidence in question. As in *Washington*, in which we determined that the search of the Sheriff's Office was reasonable, it was not clearly erroneous for Judge Harrington to conclude that the search of the Charles County Sheriff's Office was reasonable and that the Sheriff's Office no longer possessed the T-shirt, cigarette package or sex crimes kit.

With respect to the sex crimes kit specifically, Judge Harrington observed that the affidavit from Shelly Herold reflected that the kit was not stored within the Charles County Sheriff's Office's Forensic Science Unit. Judge Harrington also recognized that the sex crimes kit had been handed over to Sergeant Watts of the Charles County Sheriff's Office on the evening the victim had been examined based upon reports from Physician's Memorial Hospital and the Sheriff's Office that had been admitted into evidence. Judge Harrington, at the end of the second hearing, noted that neither the Hospital nor the Sheriff's Office possessed the sex crimes kit and instructed the State to explore other facilities that may have received the kit, namely the Maryland State Police Crime Laboratory and the FBI Crime Laboratory.[12] The documentation from the Hospital, the

---

[12] A letter from the Maryland State Police and an e-mail from the FBI, admitted into evidence as State's Exhibits 6 and 8, respectively, confirmed that there were no records that either entity had received or analyzed anything related to Johnson's case.

10

Sheriff's Office, the Maryland State Police and the FBI, together with Ms. Herold's affidavit, was prima facie proof that the sex crimes kit was no longer in the possession of the State, so that it was not clear error to conclude that the sex crimes kit no longer existed thirty-three years after it was removed from Physician's Memorial Hospital.

As to Johnson's assertion that the Hospital's protocols for collecting and handling evidence from a sexual assault victim needed to be produced, because they may have shown additional places to search, we have noted that the protocol of a place to be searched is immaterial when the hearing judge already has concluded that the location to which the protocol was related has been futilely searched. *Washington*, 424 Md. at 661-62, 37 A.3d at 949. In the present case, Judge Harrington relied upon documents admitted into evidence, created both by the Charles County Sheriff's Office and Physician's Memorial Hospital, which conclusively established that the hospital no longer had possession of the sex crimes kit. [13]

Our decision in *Horton v. State*, 412 Md. 1, 985 A.2d 540 (2009), also does not offer succor to Johnson with regard to his request for the Hospital's protocols. In *Horton*, 412 Md. at 17, 985 A.2d at 549, we ordered production of protocols only because a "former Hospital official had suggested that evidence concerning the victim" could still have been stored in the hospital. No such testimony was adduced in the present case.

---

[13] Johnson seemingly requests that the Hospital should be tasked with searching for the sex crimes kit despite its own report received into evidence reflecting that the kit had been turned over to Sergeant George Watts; that undisputed evidence undermines any requirement that the hospital perform a search. *Horton v. State*, 412 Md. 1, 985 A.2d 540 (2009), discussed *infra*.

Here, Johnson merely asserts that "more than just blood was taken", so that the Hospital should be searched or at least queried regarding its protocols for collecting specimens in a sex crimes kit. The Hospital report admitted into evidence and relied upon by Judge Harrington, however, indicates that only "BLOOD" had been collected from the victim and included in the sex crimes kit, which was prima facie proof that only blood was taken. Johnson's mere assertion, without more, that other scientific identification evidence was collected does not render the search unreasonable.

With regard to Johnson's contention that he should have been provided the Charles County Sheriff's Office's property logbooks, because his counsel could have reviewed them to determine if there were errors in their compilation, we chalk this up again to mere speculation, rather than based upon proof of a mistake. We have determined, however, that speculation is not sufficient to overcome a prima facie showing that the State followed its procedures for storing and maintaining evidence. *Blake II*, 418 Md. at 461-62, 15 A.3d at 797.

In *Blake II*, Blake sought for testing, under Section 8-201, evidence from his 1982 conviction of first degree rape and first degree sex offense. He asserted that evidence from his trial may have been held in the State's Attorney's Office following his trial and, therefore, a reasonable search must have included the State's Attorney's Office. We rejected Blake's argument, first opining that it "is reasonable to conclude that the evidence sought to be tested was handled in conformity with the routine practice of the Circuit Court and the Police Department"; we then acknowledged that a tape recorded statement by the prosecutor in Blake's criminal trial "confirming that Assistant State's Attorneys did not

12

take custody of exhibits at the conclusion of criminal trials" established that the evidence was not held by the State's Attorney. *Id.* at 460, 462, 15 A.3d at 796, 797. We reasoned that, when "it has been established that the prosecutor's office does not take custody of exhibits", the circuit court could properly deny a request for a search of the prosecutor's office. *Id.* at 462, 15 A.3d at 797. In the case before us, similarly, the logbooks were reviewed, the locations searched and the detail of their compilation and searches were produced; Johnson adduced no proof that there were mistakes in the compilation of the logbooks and in the locations searched.

Johnson, however, urges that the State had produced a logbook in *Arey II*, 422 Md. 328, 29 A.3d 986 (2011), and so his request for the Charles County Sheriff's Office's logbooks should have been granted. Whether Arey received a logbook was not in issue in *Arey II* and did not form the basis for any decision by the trial court or this Court. The reversal of the trial court's decision in *Arey II* resulted from our determination that Arey should have had an opportunity in the circuit court to contest evidence adduced by the State, which had nothing at all to do with the production of logbooks.

In conclusion, Judge Harrington's findings that the State had performed a reasonable search for the T-shirt, cigarette pack and sex crimes kit and that they no longer were in the possession of the Charles County Sheriff's Office were not clearly erroneous, and we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY IS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY APPELLANT.**

13